IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Curtis Jones, | ) | C/A No. 3:10-776-MBS-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Hydro Conduit Corp., *d/b/a Rinker Materials* | ) | |
| *Concrete Pipe Division*, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The plaintiff, Curtis Jones ("Jones"), filed a Complaint in the Court of Common Pleas in Richland County asserting violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq.; the Immigration Reform and Control Act, 8 U.S.C. § 1324b;[1] wrongful termination; breach of implied covenant of good faith and fair dealing; and breach of contract accompanied by a fraudulent act. The defendant, Hydro Conduit Corp. ("Hydro"), removed the case to federal district court pursuant to 28 U.S.C. § 1441, asserting jurisdiction based upon 28 U.S.C. § 1331. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC for a Report and Recommendation on the defendant's amended motion for summary judgment. (ECF No. 38.) Jones filed a response in opposition (ECF No. 41), and the defendant filed a reply (ECF No. 42). Having reviewed the parties' submissions and the applicable law, the court finds that Hydro's motion should be denied in part and granted in part.

---

[1] Jones has since abandoned his claim based on this statute. (See Pl.'s Mem. Opp'n Am. Mot. Summ. J., ECF No. 41 at 1, 10.)



### BACKGROUND

This "reverse discrimination" case arises out of Jones's discharge from employment for allegedly violating a safety rule. Jones, who is apparently of Anglo-Saxon descent, alleges that Hydro discriminated against him based on his national origin in favor of Hispanic employees. The following facts are either undisputed or are taken in the light most favorable to the non-moving party, to the extent they are supported by the record.

Jones began working for the defendant's predecessor in 2004 and maintained a good employment record. In 2007 Jones's employer was acquired by Hydro, a Mexican-based company. Around the time of Jones's termination in early 2008, the majority of Hydro's employees were Hispanic.

After the corporate acquisition Jones continued his duties, which primarily included operating the Hawkeye machine to manufacture large diameter concrete pipe. As part of his duties, Jones had to clean the "green" or "plastic" concrete off the belt that fed concrete to the pipe forms. Cleaning off the belt required Jones to stand on a 3- to 4-foot platform with safety rails and use a 7-foot air wand to blow compressed air onto the concrete to remove it from the belt. Jones operated the Hawkeye machine and cleaned the belt in the same manner every day of his employment for nearly four years. During his employment, he served on the company's safety committee and trained others to operate the Hawkeye and clean the belt. Until the incident at issue in this case, he never received a safety warning. Approximately one month before his termination, his supervisors commended him for his attention to safety while he was cleaning off the belt of the Hawkeye.

During his employment, Jones was trained regarding the lock out/tag out ("LOTO") safety procedure that was required in certain maintenance situations. The LOTO procedure requires the



employee to turn of the machine in question and secure it with a lock and key unique to that employee. This procedure is designed to ensure that no employee energizes the machine while another employee is performing maintenance on it. The LOTO procedure is crucial to employee safety and is considered a "zero tolerance" procedure; thus, the penalty for violation of the policy can be termination. Although Jones received training regarding the LOTO procedure, he was never informed that cleaning the belt of the Hawkeye machine required the LOTO procedure and never in his tenure did he lock out and tag out the Hawkeye when cleaning off the belt.

Policy 546, Hydro's written LOTO policy, which was apparently the same as its predecessor company's, provides in pertinent part:

> B.  Violation of the Lock-Out/Tag-Out procedures is subject to disciplinary action up to and including termination. When a violation of the Lock-Out/Tag-Out procedure is believed to have occurred, the individuals involved will be suspended. An investigation will be conducted and the results reported to management. After a review of the facts, and with consideration of any mitigating circumstances, disciplinary action will be taken, as appropriate.
>
> C.  Rinker Materials Corporation shall have "Zero Tolerance" whenever a Rinker Materials Corporation employee is found to have *knowingly* violated, or if a supervisor or manger, knowingly allowed a violation of Lock-Out/Tag-Out procedures; in such case the disciplinary action will be termination.

(ECF No. 38-2 at 148-49) (emphasis added).

On January 20, 2008, James Eager, a United States citizen born in Mexico who became the plant manager in Columbia in 2007, observed Jones cleaning the belt of the Hawkeye. Eager noticed that Jones had not locked out and tagged out the machine. Eager did not question Jones about this but rather fetched Ryan Kistler, the plant safety coordinator, to "witness" that Jones had not locked out and tagged out the Hawkeye before cleaning the belt. Eager and Kistler then approached Jones



about his failure to follow the LOTO procedure. Jones explained that he had never been informed that this type of cleaning required LOTO and that he had always cleaned the belt without LOTO. Jones was instructed to finish his work.

The next day when Jones appeared for work he was informed that he was being sent home for violating the LOTO policy. He was subsequently discharged and replaced by Sidronio Lopez, who is Mexican. Jones has presented evidence that Lopez's personnel file contains documentation indicating different birth dates. Additionally, e-mail correspondence indicates that at some point between Lopez's initial hire in 2002 and January of 2005 Lopez obtained a "new SSN." (Manolas Dep. Ex. 7, ECF No. 41-12 at 21.) Lopez had been out of work with an ankle injury and was scheduled to return to work at approximately the time when Jones was fired. Lopez's pay was approximately four dollars less per hour than Jones's. The crux of Jones's case is that Hydro fired him pretextually for violating safety procedures so it could replace him with a lower paid, Hispanic worker.[2]

## DISCUSSION

**A.     Summary Judgment Standard**

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law."

---

[2] Jones suggests that Lopez was an undocumented, illegal immigrant. This evidence appears to relate to Jones's claim for wrongful discharge in violation of state public policy. The court observes that Title VII's prohibitions of unlawful employment practices extend to national origin, not to citizenship or alienage. See Espinoza v. Farah Mfg. Co., Inc., 414 U.S. 86, 93 (1973). Under Title VII, the citizenship of the parties at issue is not the question; "national origin" refers to an individual's ancestry, not his or her citizenship. See id. at 89. Consequently, the question before the court with regard to his Title VII claim is whether Hydro discriminated against Jones, who is presumably of Anglo-Saxon ancestry, in favor of Hispanic workers.



Fed. R. Civ. P. 56(a).  A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material fact*."  Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987) (emphasis in original) (internal quotation marks & citation omitted).  A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  Id. at 257.

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor.  Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002).  The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms.  See id. at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

PJG

**B.     Burden Shifting Framework in Employment Cases**

A plaintiff may demonstrate discrimination through direct or circumstantial evidence. When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the McDonnell Douglas burden-shifting framework. Warch v. Ohio Casualty Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Pursuant to this framework, once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. Merritt v. Old Dominion Freight, 601 F.3d 289, 294 (4th Cir. 2010). The defendant's burden "is a burden of production, not persuasion." Reeves, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, "the McDonnell Douglas frame-work—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." Id. (internal quotation marks & citations omitted).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was " 'not its true reason[], but [was] a pretext for discrimination.' " Merritt, 601 F.3d at 294 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Accordingly, the plaintiff's burden of demonstrating pretext " 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.' " Merritt, 601 F.3d at 294 (quoting Burdine, 450 U.S. at 256) (alterations in original); see also Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005). To meet this "merged" burden, the employee may prove by a preponderance of the evidence that the decision maker's



affidavit is untrue or that the employer's proffered explanation is unworthy of credence. Burdine, 450 U.S. at 256.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148. However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. Id. Accordingly, the court must evaluate "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Id. at 148-49. "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination." Merritt, 601 F.3d at 294-95.

**C.    Jones's Claims**

**1.    Title VII Claim**

Title VII prohibits employment discrimination based upon national origin. 42 U.S.C. § 2000e-2. To establish a *prima facie* case of disparate treatment based on an alleged discriminatory

discharge, a plaintiff must first demonstrate that:[3] (1) he is a member of the protected class; (2) his employment was terminated; (3) at the time of his termination, he was performing at a level that met the employer's legitimate expectations; and (4) his position remained open or was filled by a similarly qualified individual outside the protected class. See Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2006) (quoting Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 285 (4th Cir. 2004) (*en banc*)); see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). The only element in dispute in this case is whether Jones can show that he was meeting Hydro's legitimate expectations at the time of his discharge. The sole reason offered by Hydro in support of its position that Jones was not meeting its expectations is the alleged safety incident at issue for which Jones was terminated.[4]

The court finds that, viewing the disputed facts in the light most favorable to Jones, a reasonable jury could find that Jones was meeting Hydro's legitimate expectations. Hydro does not dispute that Jones had an excellent employment record up until the incident at issue. (Kistler Dep. at 18:18-21, ECF No. 41-10 at 3; Greene Dep. at 28:23-29:11, ECF No. 38-3 at 28-29; see also Pl.'s Mem. Opp'n Mot. Summ. J at 5, ECF No. 41 at 5.) Although Hydro argues that Jones was not

---

[3] Although the defendant observes that some courts have used a "heightened" *prima facie* test in reverse discrimination cases, the United States Court of Appeals for the Fourth Circuit has expressly not addressed whether a plaintiff asserting reverse discrimination must meet additional requirements. See Weeks v. Union Camp Corp., 2000 WL 727771, at *6 n.13 (4th Cir. 2000); see also Lucas v. Dole, 835 F.2d 532, 534 (4th Cir. 1987). Even if the Fourth Circuit had adopted such a standard, however, the court finds that on the record presented, Jones would still meet it.

[4] Because in this case the evidence regarding this element of the *prima facie* case overlaps with Hydro's proffered legitimate, nondiscriminatory reason for Jones's discharge, the court addresses them together. See Warch, 435 F.3d at 516 ("[W]e find no impermeable barrier that prevents the . . . use of [evidence as to whether the plaintiff was meeting expectations] at different stages of the McDonnell Douglas framework.").



meeting its expectations because he violated the LOTO policy, a reasonable jury could agree with Jones that the policy did not apply to the particular cleaning procedure in which he was engaged. For example, the parties do not apparently dispute that Jones was never specifically instructed to use the LOTO procedure when cleaning the belt of the Hawkeye. Nor does the written policy expressly require it. Moreover, Hydro does not dispute that Jones cleaned the belt without using the LOTO procedure virtually every day of his employment in plain view of the very persons who ultimately reported him for the alleged violation. Although Hydro contends that Jones's supervisors never noticed that he was not using LOTO while cleaning the belt of the Hawkeye until the day of the incident at issue, a jury could reasonably infer that Jones's supervisors were aware that he was not locking out and tagging out while cleaning the belt but made no comment because it was not required for that particular procedure. In fact, Jones avers that approximately one month before his termination, his supervisors commended him on his attention to safety *while he was cleaning the belt*. Although Hydro disputes this, the deposition testimony they rely on is equivocal; a reasonable jury could believe Jones on this point.

Similarly, Jones has presented sufficient evidence from which a reasonable jury could find that Hydro's stated reason for discharging him was pretextual. The Fourth Circuit has recognized that selective application of a facially neutral policy can be probative of pretext. See Merritt, 601 F.3d at 297-99. As noted, the parties do not dispute that Jones never locked out and tagged out the Hawkeye before cleaning the belt in all of his years of employment with Hydro but was never disciplined or even warned about a violation of this ostensibly vital safety procedure until Sidronio Lopez was ready to return to work. Moreover, an employer's failure to follow its own policy can demonstrate pretext. Id. Here, Jones has shown that, contrary to Hydro's assertions that violation

of the LOTO policy compelled termination, the written policy did not necessarily mandate discharge. Rather, it provides that violation of the LOTO procedure "is subject to disciplinary action *up to and including termination*" and that "[a]fter a review of the facts, and with consideration of any mitigating circumstances, disciplinary action will be taken, *as appropriate*." (ECF No. 38-2 at 148.)[5] Moreover, Jones has presented some evidence that, if believed by a jury, the decision to terminate him was made prior to any investigation and without consideration of any mitigating circumstances, such as Jones's favorable work history and safety record and Hydro's failure to instruct him that LOTO was required for the cleaning procedure at issue. (Kistler Dep. at 65-68, ECF No. 38-6 at 65-68; but see Eager Dep. at 56-59, ECF No. 38-5 at 56-59; Blankenship Dep. at 14-18, ECF No. 38-4 at 14-18.) Finally, the record contains evidence from which a jury could reasonably find that a Latino employee, Roman Lopez, also violated the LOTO policy while working under a crane but was merely suspended for three days rather than terminated. Again, while Hydro disputes that Roman Lopez was disciplined for violating the LOTO policy and asserts that his violation was less serious, the evidence in the record conflicts as to this point. (Compare Jones Dep. at 66:22-67:11, 112:13-113:21, ECF No. 41-11 at 30-31, 42-43) (discussing meeting with management in which supervisors said that Roman Lopez had violated the LOTO policy but "[Drake] said he didn't want to fire Roman, so he give [*sic*] him three days and used him as an example") with Greene Aff. Exs. A & B, ECF No. 42-5.) In the face of such conflicting evidence, a reasonable jury could agree with Jones. For all of these reasons, the court concludes that a reasonable jury could find that Jones was a victim of unlawful discrimination and that his national origin was a motivating factor in the decision to

---

[5] While Policy 546 states that *knowing* violation will result in termination, Hydro has not identified any evidence showing that Jones's alleged violation was a knowing one; rather, all of the evidence indicates the contrary.



terminate him. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004); see also Reeves, 530 U.S. at 148-49; Merritt, 601 F.3d at 294-95, 297-99.[6]

### 2.     State Law Claims

South Carolina law indicates that, generally, contract-based claims such as breach of the implied covenant of good faith and fair dealing and breach of contract accompanied by a fraudulent act are not viable in the at-will employment context. See Grant v. Mt. Vernon Mills, Inc., 634 S.E.2d 15, 19 (S.C. Ct. App. 2006). However, "when an employee's at-will status has been altered by the terms of an employee handbook, an employee, when fired, may bring a cause of action for wrongful discharge based on breach of contract." Hessenthaler v. Tri-County Sister Help, Inc., 616 S.E.2d 694, 697 (S.C. 2005). Further, "[m]andatory, progressive discipline procedures may constitute enforceable promises. Such procedures typically provide that an employee may be fired only after certain steps are taken. When definite and mandatory, these procedures impose a limitation on the employer's right to terminate an employee at any time, for any reason." Id. (internal citations omitted); see also Grant, 634 S.E.2d at 20.

In this case, a jury could reasonably conclude that Hydro's LOTO policy altered Jones's at-will employment by providing mandatory procedures that Hydro was bound to follow in disciplining

---

[6] The court observes that Title VII's causation requirement demands only that the protected characteristic be a motivating factor in the employer's challenged decision. See 42 U.S.C. § 2000e-2(m); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004); cf. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 129 S. Ct. 2343, 2351 (2009) (requiring "but-for" causation with regard to the ADEA claims). At least one court applying Title VII case law to a state anti-discrimination law and examining circumstances similar to those alleged here has found a viable claim where discrimination is alleged to be based both on an unlawful characteristic, such as national origin, and an economic factor, such as replacing a worker with one who commands lower wages. See Mattus v. Facility Solutions, Inc., No. Civ. 05-0863(DRD), 2005 WL 3132190 (D.N.J. Nov. 21, 2005).



an employee for violation of the LOTO policy. The policy is couched in mandatory, not permissive, terms, and no evidence in the record suggests that alteration of the at-will employment relationship was disclaimed. (ECF No. 38-2 at 148) (stating that when a violation of the LOTO policy is believed to have occurred certain actions "will" be taken); see Grant, 634 S.E.2d at 20 ("[I]n the absence of a conspicuous and appropriate disclaimer, if the language in the handbook sets out mandatory, progressive discipline procedures, those procedures alter the at-will employment relationship."). Accordingly, Hydro has not demonstrated that it is entitled to a judgment as a matter of law on Jones's claims for breach of contract accompanied by a fraudulent act and breach of the implied covenant of good faith and fair dealing.

Hydro is entitled, however, to summary judgment on Jones's claim for wrongful discharge in violation of state public policy. In support of this claim, Jones relies on a statute that was enacted subsequent to his termination and provides out-of-state authority to support his argument that the statute reflects the previously existing public policy of the state of South Carolina. The court observes that the statute upon which Jones relies is contained in the South Carolina Illegal Immigration Reform Act. Immigration reform is a volatile political issue and rapidly changing area of the law; against this backdrop, the court finds it inappropriate to presume that the legislative consensus necessary to create a new cause of action predated the Act's passage to the degree that it represented a clear mandate of the state's public policy. See Barron v. Labor Finders of South Carolina, 713 S.E.2d 634, 638 (S.C. 2011); Ludwick v. This Minute of Carolina, Inc., 337 S.E.2d 213, 216 (S.C. 1985).

PJG

## RECOMMENDATION

For the foregoing reasons, the court recommends that Hydro's motion for summary judgment (ECF No. 38) be denied as to Jones's Title VII claim asserting disparate treatment based upon his national origin and as to Jones's state law breach of contract claims but granted as to Jones's claim for wrongful discharge in violation of South Carolina public policy.

_____
Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

January 10, 2012
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).