IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Curtis Jones, ) | |
| ) | C/A No. 3:10-776-MBS-PJG |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **ORDER AND OPINION** |
| Hydro Conduit Corp., d/b/a Rinker ) | |
| Materials Concrete Pipe Division, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

Plaintiff Curtis Jones is a former employee of Hydro Conduit Corp. ("Hydro"). Plaintiff filed an amended complaint on July 7, 2010, alleging wrongful termination, breach of the implied covenant of good faith and fair dealing, and breach of contract accompanied by a fraudulent act. ECF No. 15. Plaintiff also alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the Immigration Reform and Control Act, 8 U.S.C. § 1324b ("IRCA").[1] Plaintiff, who is a white native-born American citizen, alleges that his employment was terminated based on a contrived safety violation so that he could be replaced by a person of Mexican descent who was not authorized to work in the United States and who earned lower wages. Plaintiff contends that he has suffered discrimination on the basis of national origin and race.

This matter is before the court on a motion for summary judgment filed by Hydro on May 12, 2011. ECF No. 38. Plaintiff filed a response in opposition on May 31, 2011. ECF No. 41. Hydro filed a reply on June 10, 2011. ECF No. 42. In accordance with 28 U.S.C. § 636(b) and

---

[1] Plaintiff has abandoned his IRCA claim. *See* ECF No. 41 at 1 & 10.

Local Rule 73.02, D.S.C., the within action was referred to United States Magistrate Judge Paige J. Gossett for pretrial handling. On January 10, 2012, the Magistrate Judge issued a Report and Recommendation in which she recommended that Hydro's motion for summary judgment be denied as to Plaintiff's Title VII and breach of contract claims. ECF No. 46. The Magistrate Judge recommended that Hydro's motion be granted as to Plaintiff's claim for wrongful discharge in violation of South Carolina public policy. Hydro filed objections to the Report and Recommendation on January 27, 2012. ECF No. 47. Plaintiff filed a response on February 22, 2012. ECF No. 50.

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1). This court may also receive further evidence or recommit the matter to the Magistrate Judge with instructions. *Id.* This court is obligated to conduct a *de novo* review of every portion of the Magistrate Judge's report to which objections have been filed. *Id.*

## FACTS

The following facts are either undisputed or taken in the light most favorable to Plaintiff, to the extent they are supported by evidence in the record. Plaintiff began working as a full-time employee for Rinker Materials Concrete Pipe Division in June 2004. ECF No. 38-2 at 26. His primary job involved operating the Hawkeye machine, which produces large-diameter concrete pipe. ECF No. 38-5 at 13 & 16. The Hawkeye includes a hopper, a conveyer belt, and a chute connected in sequence and suspended on an arm approximately ten feet from the ground. *Id.* at

16-17. The conveyor belt feeds concrete from the hopper into the chute, and the concrete falls from the chute into pipe forms on the ground below. *Id.* at 17; ECF No. 38-6 at 23. The arm can be rotated from side to side, between two stations on the ground, using a main control. ECF No. 38-6 at 23. Plaintiff's job required that he regularly clean the conveyor belt by blowing wet concrete off the belt with compressed air before the concrete hardened. *Id.* at 31. Plaintiff used a seven-foot aluminum tube connected to a compressed air hose to remove the wet concrete. ECF No. 38-2 at 41. Plaintiff would stand on a platform ladder to do this job. *Id.* at 71.

Hydro has a "Lock-Out/Tag-Out" ("LOTO") policy to ensure the safety of employees who are working near potentially dangerous machinery. *See* ECF No. 38-2 at 148-51. The LOTO policy requires the "isolation of electrical, mechanical, hydraulic, pneumatic, chemical, thermal, gravitational, or other energy prior to equipment maintenance or removal and when working within [the] 'danger zone.'" *Id.* at 150. The "danger zone" is defined as "[t]hat area within or around a piece of equipment or machine where a sudden energization or release or residual energy could cause an employee physical harm." *Id.* According to Plaintiff's direct supervisor, James Eager, any employee who is "going to work on [a] machine or clean out a machine" must lock out the machine by disconnecting its power sources and placing locks that prevent the power sources from being reconnected. ECF No. 38-5 at 31. However, Safety Coordinator Ryan Kistler testified that lockout would not necessarily be required for every cleaning procedure, such as "floor-type level maintenance" on the Hawkeye including "cleaning the table or scraping off some of the form" or "just blowing off with the air wand or something like that." ECF No. 38-6 at 64-65.

Hydro's LOTO "Zero Tolerance Policy" states, in relevant part, as follows:

3

> B.  Violation of the Lock-Out/Tag-Out procedures is subject to disciplinary action up to and including termination.  When a violation of the Lock-Out/Tag-Out procedure is believed to have occurred, the individuals involved will be suspended.  An investigation will be conducted and the results reported to management.  After a review of the facts, and with consideration of any mitigating circumstances, disciplinary action will be taken, as appropriate.
>
> C.  [Hydro] shall have "Zero Tolerance" whenever a[n] employee is found to have knowingly violated, or if a supervisor or manager, knowingly allowed a violation of Lock-Out/Tag-Out procedures; in such case the disciplinary action will be termination.

ECF No. 38-2 at 148-49.  On June 3, 2004, Plaintiff signed a "Lockout/Tagout Procedure Certification" acknowledging that he had been trained on LOTO procedures for machines including the Hawkeye.  The form included the following language:

> I understand the hazards of electricity, hydraulic force and machines in motion.  I understand that I have been trained to protect myself by not reaching into (breaking the plane) any machinery until I have personally Locked out and/or Tagged out all sources of energy and ensured that the machinery controls have been disabled.
>
> . . .
>
> I understand that VIOLATING THE LOCKOUT-TAGOUT PROCEDURE will result in disciplinary action up to and including termination of employment.

ECF No. 38-2 at 144.  Plaintiff states that he and other Hydro employees were very concerned about safety, and that the zero-tolerance policy was "serious business."  *Id.* at 44-45.

On January 20, 2008, Plaintiff was cleaning the Hawkeye conveyor belt according to the procedure described above when Eager observed that Plaintiff had not locked out the power sources for the Hawkeye.  ECF No. 38-2 at 39; ECF No. 38-5 at 29-31.  Eager did not say anything to Plaintiff but went to get Ryan Kistler because Eager would not confront an employee about a LOTO violation without a witness.  ECF No. 38-5 at 31.  Eager and Kistler confronted

4

Plaintiff about his failure to lock out the power sources. *Id.* at 50-51. Plaintiff stated that he was doing the procedure the way he was trained and the way it had always been done, and that LOTO was not required to clean the conveyor belt in this manner. ECF No. 38-2 at 39-40. Eager told Plaintiff that an investigation must be done, and instructed him to go home and return the next day. ECF No. 38-6 at 39. Plaintiff finished cleaning and then went home. ECF No. 38-5 at 51-52.

Plaintiff returned the next morning and met with Eager and Kistler. ECF No. 38-5 at 53. Eager states that he informed Plaintiff that he would be suspended for three days. *Id.* However, Kistler states that Plaintiff was told that he was immediately terminated. ECF No. 38-6 at 41. In any event, Eager contacted Operations Manager James Blankenship and General Manager Dwayne Green and explained what he had observed. ECF No. 38-4 at 7 & 14; ECF No. 38-5 at 6 & 57. Blankenship states that Plaintiff was terminated following an investigation that revealed a LOTO violation. ECF No. 38-4 at 15. Blankenship and Green had a telephone conversation with Plaintiff about the incident in the course of the investigation. *Id.* at 15-16. On January 24, 2008, Dwayne Green sent a letter to Plaintiff stating that his employment was terminated pursuant to the LOTO zero-tolerance policy. ECF No. 38-2 at 167. No Hydro manager has stated that Plaintiff was performing his job unsatisfactorily before the alleged LOTO violation, or that there was any other reason to terminate his employment. Additionally, no Hydro manager has stated that Plaintiff's general cleaning procedure was improper; rather, the only complaint is that Plaintiff had not locked out the power supplies before cleaning the conveyor belt.

Plaintiff states that he was never instructed that the LOTO policy applied to the cleaning

of the Hawkeye conveyor belt with compressed air tube. ECF No. 38-2 at 40. Plaintiff further states that there is "no danger" during this procedure, and that "none of [his] body parts are near a moving part within seven feet." *Id.* at 45. Plaintiff insists that "[t]he machine does not have to be locked out during th[is] procedure." *Id.* at 46. He states that the purpose of using a seven-foot pole and a short ladder is to ensure that neither his body nor his tools are "in" the machine and to ensure that his body is "out of the way" and would not be hit if the machine were to turn. *Id.* at 59. Approximately one month before Plaintiff was terminated, Mike Shuk,[2] Dwayne Green, and Eager observed Plaintiff cleaning the conveyor belt using a ladder and a seven-foot compressed air tube and congratulated him on his safety practices. *Id.* at 46-47.

After Plaintiff's termination, his previous job on the Hawkeye was given to Sidronio Lopez. ECF No. 38-6 at 20. Plaintiff had previously trained Lopez to run the Hawkeye. ECF No. 38-2 at 108. Lopez is originally from Mexico and of Hispanic descent, and he allegedly told Plaintiff that he was working in the United States illegally. ECF No. 38-6 at 52-53; ECF No. 38-2 at 119; ECF No. 41-7 at 8. Lopez was out on leave due to an injury, and he returned to work around the time Plaintiff was terminated. ECF No. 38-2 at 118-19. Although Plaintiff was earning $16.85 per hour in 2008 before he was terminated, Lopez was earning only $12.82 in 2008. ECF No. 41-7 at 8.

At the time of Plaintiff's termination, eight of the twenty-four employees at the Columbia Pipe location were Hispanic. *See* ECF No. 41-7 at 8. Between April 8, 2004, and April 1, 2009, sixteen employees at the Columbia Pipe location were involuntarily terminated; of these, nine were Hispanic. *See* ECF No. 38-3 at 62. Additionally, Plaintiff was one of seven employees

---

[2]      Mr. Shuk's job title is not clear from the record.

involuntarily terminated in 2008; the six other employees were all Hispanic. *See id.* Eager, Plaintiff's supervisor who witnessed the alleged LOTO violation, is a United States citizen of Hispanic descent who was born in Mexico. ECF No. 38-5 at 7 & 76.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted when a moving party has shown "[that] the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The evidence presents a genuine issue of material fact if a "reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The facts and any inferences drawn from the facts should be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The party seeking summary judgment bears the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party makes this showing, the opposing party must set forth specific facts showing there is a genuine issue for trial. *Id.*

## DISCUSSION

**I.    Discrimination Based on Race and National Origin**

A plaintiff may demonstrate discrimination using direct or circumstantial evidence. Absent direct evidence, a plaintiff alleging that his employment was terminated for discriminatory reasons must establish a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) his employment was terminated; (3) he was performing his

job duties at a level that met his employer's legitimate expectations at the time of the termination; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005). Once a plaintiff establishes a prima facie case of discrimination, "the burden of production then shifts to the employer to articulate a legitimate, non-discriminatory justification for its allegedly discriminatory action." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). If the employer carries this burden, the plaintiff must then "prove by a preponderance of the evidence that the neutral reasons offered by the employer were not its true reasons, but were a pretext for discrimination." *Id.* (quotation omitted). In other words, the plaintiff must ultimately prove that he was the victim of intentional discrimination. *Id.*

    A.    **The Magistrate Judge's Report and Recommendation**

The Magistrate Judge first found that the only disputed element of Plaintiff's prima facie case of discrimination is whether Plaintiff was meeting Hydro's legitimate expectations at the time he was terminated. ECF No. 46 at 8. The Magistrate Judge noted that "the sole reason offered by Hydro in support of its position that [Plaintiff] was not meeting its expectations is the alleged safety incident at issue for which [Plaintiff] was terminated." *Id.* However, the Magistrate Judge concluded that a reasonable jury could find that Plaintiff was meeting Hydro's legitimate expectations. *Id.* The Magistrate Judge stated as follows:

> Although Hydro argues that Jones was not meeting its expectations because he violated the LOTO policy, a reasonable jury could agree with Jones that the policy did not apply to the particular cleaning procedure in which he was engaged. For example, the parties do not apparently dispute that Jones was never specifically instructed to use the LOTO procedure when cleaning the belt of the Hawkeye. Nor does the written policy expressly require it. Moreover, Hydro does not dispute that Jones cleaned the belt without using the LOTO procedure virtually every day of his employment in plain view of the very persons who

>ultimately reported him for the alleged violation.  Although Hydro contends that Jones's supervisors never noticed that he was not using LOTO while cleaning the belt of the Hawkeye until the day of the incident at issue, a jury could reasonably infer that Jones's supervisors were aware that he was not locking out and tagging out while cleaning the belt but made no comment because it was not required for that particular procedure.  In fact, Jones avers that approximately one month before his termination, his supervisors commended him on his attention to safety *while he was cleaning the belt*.

*Id.* at 8-9.

The Magistrate Judge also found that Plaintiff had presented evidence from which a jury could reasonably find that Hydro's stated reason for discharging him was pretextual.  ECF No. 46 at 9.  The Magistrate Judge noted that selective application of a facially neutral policy or an employer's failure to follow its own policies may demonstrate pretext.  *Id.*  The Magistrate Judge found that "the parties do not dispute that [Plaintiff] never locked out and tagged out the Hawkeye before cleaning the belt in all of his years of employment with Hydro but was never disciplined or even warned about a violation of this ostensibly vital safety procedure until Sidronio Lopez was ready to return to work."  *Id.*  The Magistrate Judge also found that Hydro had not identified any evidence showing that any LOTO violation by Plaintiff was a "knowing" violation requiring termination.  *Id.* at 10 n.5.  The Magistrate Judge found that Plaintiff had presented evidence that "the decision to terminate him was made prior to any investigation and without consideration of any mitigating circumstances, such as [his] favorable work history and safety record and Hydro's failure to instruct him that LOTO was required for the cleaning procedure at issue."  *Id.* at 10.  Finally, the Magistrate Judge found that "the record contains evidence from which a jury could reasonably find that a Latino employee, Roman Lopez, also violated the LOTO policy while working under a crane but was merely suspended for three days rather than terminated."  *Id.*

### B. Hydro's Objections

Hydro first argues that overwhelming evidence establishes that the LOTO policy applied to the cleaning procedures Plaintiff was performing when he was accused of violating this policy. ECF No. 47 at 3. Hydro argues that it is irrelevant that "the specific cleaning procedure in which [Plaintiff] was engaged is not discussed in any LOTO policy" because no specific cleaning or maintenance procedures are addressed in the LOTO policy – rather, the LOTO policy applies to all servicing and maintenance procedures. *Id.* at 5. However, this is contradicted by the testimony of Ryan Kistler, who stated that LOTO is not necessarily required for every cleaning procedure. *See* ECF No. 38-6 at 64-65. Furthermore, it is not clear that Plaintiff was working within the "danger zone," defined as "[t]hat area within or around a piece of equipment or machine where a sudden energization or release or residual energy could cause an employee physical harm." *See* ECF No. 38-2 at 150. According to Plaintiff's deposition testimony, he was standing at least seven feet away from the conveyor belt and did not place either his body or compressed air tube within the moving parts of the Hawkeye during the cleaning. Plaintiff also testified that he was standing out of the range of the moving arm and would not have been hit even if the arm had moved. Although, as Hydro notes, every member of management involved in Plaintiff's termination has stated that LOTO was required for this procedure, this conflicts with Plaintiff's testimony that these same managers had previously commended him for performing the job without locking out the power supplies.

Hydro correctly points out that the question is not whether an employer's reason for terminating an employee is correct – it is whether the employer genuinely believed and was motivated by the stated reason. ECF No. 47 at 10. However, because direct evidence of

subterfuge is not likely to exist in most cases, circumstantial evidence will frequently be the only means of proving an employer's motives. Here, Plaintiff has testified that he performed the cleaning procedure without locking out the power supplies multiple times daily for nearly four years. Eager testified that he saw Plaintiff for up to five hours each day while walking around the plant but had never noticed any violation before. ECF No. 38-5 at 36. Also, as noted above, Plaintiff testified that approximately one month before he was terminated, Eager and two Hydro managers had observed him cleaning the conveyor belt according to his usual procedure and had congratulated him on his safety practices. It would not be unreasonable for a jury to conclude, based on this evidence, that someone in Hydro's management must have seen Plaintiff cleaning the conveyor belt without locking out the power supplies but failed to discipline him because management did not consider Plaintiff's conduct to be a LOTO violation. If an employer suddenly terminates an employee for doing something that has long been condoned, a reasonable juror could find that this conduct is not the true reason for the termination.

      Hydro argues that there is no evidence that the LOTO policy was applied differently to different employees. ECF No. 47 at 12. However, Plaintiff testified that Roman Lopez, a Mexican employee, committed a LOTO violation but was not terminated. *See* ECF No. 38-2 at 112-13. According to Plaintiff's testimony, Bryan Drake stated that Lopez had committed a LOTO violation by working under a crane with a suspended load, but gave Lopez only a three-day suspension rather than terminating him. *Id.* Hydro notes that the "Employee Warning Notice" signed by Drake on December 19, 2005, shortly after this incident, stated that it was a "violation of getting under a suspended load" and did not mention any LOTO violation. ECF No. 42-5 at 5-6. Hydro also notes that a December 16, 2005 e-mail sent by Drake to various

Hydro employees characterized the incident as a "critical safety rule violation" and made no reference to LOTO. *Id.* at 8. Although Hydro had identified contrary evidence, the court cannot find that no reasonable juror could believe Plaintiff's testimony.

Because Plaintiff has put forth evidence sufficient to show a prima facie case of discrimination and to show that the stated reason for termination is pretextual, summary judgment is not appropriate in this case. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). Although such a showing is not always adequate to survive summary judgment, in this case there is neither a conclusive alternative reason for Plaintiff's termination nor "abundant and uncontroverted" evidence that no discrimination occurred. *See Reeves*, 530 at 148. Because Plaintiff's claims turns on numerous disputed issues of fact, summary judgment is denied.

## II.     Breach of Contract

"South Carolina has long recognized the doctrine of employment at-will," which "allows either party to terminate the employment 'for any reason or no reason' without being subject to a claim for breach of contract." *Grant v. Mount Vernon Mills, Inc.*, 634 S.E.2d 15, 19 (S.C. Ct. App. 2006). "But when an employee's at-will status has been altered by the terms of an employee handbook, an employee, when fired, may bring a cause of action for wrongful discharge based on breach of contract." *Hessenthaler v. Tri-County Sister Help*, 616 S.E.2d 694, 697 (S.C. 2005). "Mandatory, progressive discipline procedures may constitute enforceable promises. . . . Such procedures typically provide that an employee may be fired only after certain steps are taken. When definite and mandatory, these procedures impose a limitation on the

employer's right to terminate an employee at any time, for any reason." *Hessenthaler*, 616 S.E.2d at 698. "[S]uch provisions must be stated in mandatory or promissory terms to create an issue of fact as to whether an implied contract exists." *Bagwell v. Fafard, Inc.*, 2007 WL 2022187 at *4 (D.S.C. July 11, 2007). Furthermore, "the handbook promise must restrict the right of an employer to discharge." *Lawrence v. Westinghouse Savannah River Co., Inc.*, 2005 WL 3968031 at *4 (D.S.C. March 31, 2005).

"The issue of whether an employee handbook constitutes a contract should be submitted to the jury when the issue of the contract's existence is questioned and the evidence is either conflicting or is capable of more than one inference." *Hessenthaler*, 616 S.E.2d at 697. However, "a court should intervene to resolve the handbook issue as a matter of law . . . if the handbook statements and [any] disclaimer, taken together, establish beyond any doubt tha[t] an enforceable promise either does or does not exist." *Id.*

### A.     The Magistrate Judge's Report and Recommendation

The Magistrate Judge found that "a jury could reasonably conclude that Hydro's LOTO policy altered Jones's at-will employment by providing mandatory procedures that Hydro was bound to follow in disciplining an employee for a violation of the LOTO policy." ECF No. 46 at 11-12. The Magistrate Judge further stated that "[t]he policy is couched in mandatory, not permissive, terms, and no evidence in the record suggests that alteration of the at-will employment relationship was disclaimed." *Id.* at 12. Accordingly, the Magistrate Judge found that Hydro was not entitled to judgment as a matter of law.

### B.     Hydro's Objections

Hydro objects to the Magistrate Judge's determination that the language of the LOTO

zero-tolerance policy may create an enforceable promise. ECF No. 47 at 18-19. Although Hydro acknowledges that mandatory progressive discipline procedures may create enforceable promises, it argues that "[u]nlike those cases where an employer's handbook or discipline policy sets out certain escalating steps that must be taken before an employee can be terminated, such as verbal counseling followed by written warnings and then termination, the language of the LOTO policy in this case only requires that discipline be administered." *Id.* at 19. Plaintiff points to language in the LOTO policy stating that the individuals involved "will be suspended," that an investigation "will be conducted," and that "[a]fter review of the facts, and with consideration of any mitigating circumstances, disciplinary action will be taken as appropriate." ECF No. 50 at 7. Plaintiff also points to language stating that there will be zero tolerance if an employee "is found to have knowingly violated" LOTO procedures or a supervisor "knowingly allowed a violation." *Id.* Accordingly, Plaintiff argues, "a reasonable jury could find . . . that Defendant was required to consider mitigating circumstances and find a knowing violation before terminating an employee for a LOTO violation." *Id.*

As Plaintiff notes, the LOTO policy contains no disclaimer stating that the terms of at-will employment are not altered. However, the court finds that promises to conduct an investigation and to consider mitigating circumstances are too vague and indefinite to form the basis of a contract. The policy does not elaborate on the type of "investigation" that must be conducted, and there is no reason why the mere observation of a violation by a supervisor and a brief discussion with the employee could not constitute an "investigation." Similarly, the policy does not specify what sort of factors should be considered as "mitigating circumstances," or how the decision makers are to weigh them. Furthermore, the policy allows disciplinary action to be

taken "as appropriate" and does not require any particular findings before certain disciplinary actions are taken. Rather than setting out progressive steps of discipline to which an employee is entitled before being terminated, the policy generally describes the internal procedures Hydro will use in deciding how to discipline an employee for an alleged LOTO violation. Such language cannot reasonably be viewed as "restrict[ing] the right of an employer to discharge." *Lawrence*, 2005 WL 3968031 at *4. Accordingly, Hydro is entitled to summary judgment on Plaintiff's contract claims.

### III.    Wrongful Termination in Violation of Public Policy

The Magistrate Judge recommended that summary judgment be granted as to Plaintiff's claim for wrongful termination. ECF No. 46 at 12. The Magistrate Judge stated:

> In support of his claim, Jones relies on a statute that was enacted subsequent to his termination and provides out-of-state authority to support his argument that the statute reflects the previously existing public policy of the state of South Carolina. The court observes that the statute upon which Jones relies is contained in the South Carolina Illegal Immigration Reform Act. Immigration reform is a volatile political issue and rapidly changing area of the law; against this backdrop, the court finds it inappropriate to presume that the legislative consensus necessary to create a new cause of action predated the Act's passage to the degree that it represented a clear mandate of the state's public policy. *See Barron v. Labor Finders of South Carolina*, 713 S.E.2d 634, 638 (S.C. 2011); *Ludwick v. This Minute of Carolina, Inc.*, 337 S.E.2d 213, 216 (S.C. 1985).

*Id.* Although Plaintiff relies upon *Evans v. Taylor Made Sandwich Co.*, 522 S.E.2d 350 (S.C. Ct. App. 1999), to argue that "whether a discharge violates the public policy of the State is best left to the jury," this holding was explicitly overruled by *Barron* in 2011. *Barron*, 713 S.E.2d at 616-17. The court agrees with the Magistrate Judge's analysis and holds that the South Carolina Illegal Immigration Reform Act did not represent a "clear mandate of the state's public policy" prior to its passage. Accordingly, Hydro is entitled to summary judgment on this claim.

## CONCLUSION

After a *de novo* review of the record in this case, the court adopts the Magistrate Judge's analysis as to Plaintiff's Title VII and wrongful termination claims only. Hydro's motion for summary judgment is denied as to Plaintiff's Title VII claim and granted as to Plaintiff's remaining claims. The case will be placed on a future trial roster.

**IT IS SO ORDERED**.

s/ Margaret B. Seymour
Margaret B. Seymour
Chief United States District Judge

Columbia, South Carolina

March 30, 2012.